FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

2009 SEP -1 PM 2: 27

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS. FLORIDA

MARCELO TORRES-LUTZ and
CECILIA TORRES,

Plaintiffs,

v.

SHANDONG TAIHE DONGXIN STOCK CO., LTD.,
BEIJING NEW BUILDING MATERIALS CO., LTD.,
TAI'AN TAIHE SHENGYUAN INDUSTRY AND TRADE
CO., LTD.,
TAI'AN TAIHE ADVERTISEMENT CO., LTD., and
TAIHE PAPER INDUSTRY,

Defendants.
_____/

2: 09 - cV - 575 - FtM- 99 DNP

CASE NO.:_____

**JURY TRIAL DEMANDED**

UNASSIGNED

**DOUGLAS N. FRAZIER
U.S. MAGISTRATE JUDGE**

**COMPLAINT**

This is a products liability action for damages caused by defective Chinese

drywall manufactured and supplied by the Defendants.  Plaintiffs expect that this action

will be consolidated with Multi-District Litigation proceeding number 2047, *In re*

*Chinese-Manufactured Drywall Products Liability Litigation*, and the MDL 2047 Plaintiffs'

Steering Committee has indicated that it will identify this action as a "tag-along" shortly

after the filing of this complaint.

**INTRODUCTION**

1.      It is undisputed that some of the drywall imported from Chinese

manufacturers and installed in buildings in the United States is contaminated

with chemicals that leach out and damage the structure and contents of buildings.

2.      Damage from defective drywall can be found throughout a house, even when the drywall is located only in one part of that house.

3.      The extent and expense of necessary remediation is unknown at this time, but it is believed that, at a minimum, all defective drywall must be removed, safely disposed of, and replaced.  All other objects in the home that have been damaged must also be disposed of and replaced.  The cost of such remediation easily exceeds $100,000 in the average house.

4.      The United States Consumer Product Safety Commission, the Florida Department of Health, the United States Environmental Protection Agency, and other government agencies all have active, ongoing investigations into the problems caused by defective Chinese drywall.

5.      It is estimated that as many as 100,000 American houses are contaminated with this product.

6.      It is currently believed that most of the drywall was imported during a period in the middle of this decade when drywall was in short supply due to high demand caused by a building boom, massive rebuilding from hurricane damage, and other factors.

7.      Although it is reported that there are adverse health effects as a result of exposure to defective Chinese drywall, this action currently does not include

claims for personal injuries. Plaintiffs may seek leave to amend the complaint to add such claims at a future date.

8.    Plaintiffs' home was built using drywall manufactured, processed, exported, imported, distributed, delivered, supplied, inspected, marketed and/or sold by the Defendants.

9.    The drywall manufactured, processed, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants to build Plaintiffs' home is defective and emits various sulfurous gases and/or other volatile organic chemical compounds through "off-gassing" that cause corrosion of HVAC coils and refrigerator units, microwaves, televisions, computers, jewelry, furniture, fixtures, electrical wiring, copper tubing, plumbing components, and other household items, as well as creates noxious, "rotten egg" odors. Defendants' defective drywall further causes allergic reactions, coughing, sinus and throat infection, eye irritation, respiratory problems and other health concerns. Defendants' drywall was inherently defective and not suitable for its intended use.

## JURISDICTION AND VENUE

10.   This action lies within the original jurisdiction of the Court pursuant to 28 U.S.C. § 1332(a)(2). There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.   In a diversity case, the federal court must apply State statutes to determine if jurisdiction may be had over out-of-state defendants.  This Court has personal jurisdiction over the defendants under multiple sections of Florida's specific jurisdiction "long arm" statute, Fla. Stat. § 48.193.  Jurisdiction lies under § 48.193(1)(b) because Defendants committed a tortious act in the State and under § 48.193(2) because Defendants are "engaged in substantial and not isolated activity within this state."  Jurisdiction also lies under § 48.193(1)(f) because they produced a product that caused injury in this state during the normal course of its use.  Additional grounds for jurisdiction under § 48.193 also exist.

12.   Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. § 1391(a)(2) and (d).

## THE PARTIES

13.   The Plaintiffs in this case hired an expert inspector to confirm whether or not defective drywall was present.  During the expert investigation of each house, a camera was inserted into the wall to capture images of the drywall, and photos have been taken of these walls.  Additionally, the expert took samples of the drywall for retention.  Defective drywall was found.

14.   Plaintiffs Marcelo Torres-Lutz and Cecilia Torres own and live in a home located at 334 Cipriani Way, Venice, Florida.  The home smells strongly of sulfur.  Since moving in in 2006, their air conditioner coils have turned black

and corroded, and they have had pinholes leaking Freon, which have had to be repaired twice. Their electrical wiring, cable TV, and computer connections have also blackened. Their drywall shows the markings: "VENTURE SUPPLY INC. MFG TAIHE CHINA." The "Taihe" indicates the Taihe trade name for drywall.

15.     Defendant Shandong Taihe Dongxin Stock Co., Ltd. (Shandong Taihe) is a Chinese corporation and manufacturer of building products, including drywall. Its English-language web site advertises that Taihe "is the famous brand in the same line all over China" and that Shandong Taihe is the largest gypsum board-producing enterprise in China. Shandong Taihe manufactured the drywall in Plaintiffs' home.

16.     Defendant Beijing New Building Materials Co., Ltd. (BNBM) is a Chinese corporation and manufacturer and distributor of drywall products. According to BNBM's English-language web site, BNBM is the largest new building materials manufacturer in China. BNBM controls twenty-one production lines in China that are capable of producing 400,000,000 square meters of drywall a year—approximately a hundred and fifty million sheets of drywall. BNBM manufactured the drywall in Plaintiffs' home.

17.     Defendants Tai'an Taihe Shengyuan Industry and Trade Co., Ltd., Tai'an Taihe Advertisement Co., Ltd., and Taihe Paper Industry are Chinese corporations owned by BNBM. Through these entities, Shandong Taihe and BNBM

5

manufacture, distribute, and market their drywall products. These defendants are suppliers and distributors in the supply chain that placed Chinese drywall into Plaintiffs' home.

18.    Because the Defendants shipped their product into Florida as part of a systematic stream of commerce and distribution, all of them have subjected themselves to process under Florida's long-arm jurisdiction statute.

19.    Additional corporations may have manufactured the drywall in Plaintiffs' home. The identity of these corporations cannot be ascertained at this time because: the drywall board produced by these corporations is sealed behind fixtures and paint inside Plaintiffs' house; Plaintiffs are not presently in a position to disassemble their home to examine each board of drywall; some drywall does not bear any markings from its manufacturer; and a completely effective protocol for product identification does not yet exist. Plaintiffs expect that as Chinese drywall cases progress through pretrial discovery in MDL 2047, they will be able to identify the makers of drywall in a more efficient way than physical disassembly of all walls. Plaintiffs expect to ascertain the identity of any additional defendants through the diligent efforts of counsel after the commencement of this action, and will move the Court for leave to add these defendants.

20.    Other corporations may have been part of the supply chain that brought the drywall from its place of manufacture to Plaintiffs' home. The identity of

6

these corporations cannot be ascertained at this time without the effective

discovery vehicles expected to be made available after the commencement

of this suit, and including possible participation in MDL 2047.  Plaintiffs

expect to ascertain the identity of additional supplier defendants through the

diligent efforts of counsel and will move the Court for leave to add these

defendants.

### GENERAL ALLEGATIONS

21.   In connection with the construction of homes in the State of Florida,

homebuyers including the Plaintiffs purchased gypsum drywall, either

directly or indirectly, from various manufacturers and suppliers, including the

Defendants.

22.   Defendants negligently manufactured, processed, exported, imported,

distributed, delivered, supplied, inspected, marketed and/or sold defective

gypsum drywall, which was unreasonably dangerous in its normal use, in that

the drywall caused corrosion to HVAC coils and refrigerator units,

microwaves, televisions, computers, jewelry, furniture, fixtures, electrical

wiring, copper tubing, plumbing components, and other household items,

and caused allergic reactions, coughing, sinus and throat infection, eye

irritation, respiratory problems and other health concerns.

23.   When combined with moisture in the air, sulfur compounds contained within

the drywall can create sulfuric acid.  Sulfuric acid has been known to dissolve

solder joints, corrode coils and copper tubing—creating leaks, blackening coils and causing HVAC systems and refrigerators to fail. Sulfuric acid has also been shown to corrode copper electrical wiring and plumbing components. Not only does it blacken and corrode coils, it can harm metals such as chrome, brass, and silver.

24.    Defendants' defective drywall can not only affect HVAC systems and refrigerators, but can affect and require replacement of all sorts of household items, including but not limited to microwaves, lighting fixtures, faucets and silverware. In addition, the defective drywall has a noxious odor, akin to the smell of rotten eggs.

25.    Defendants' actions will require Plaintiffs to remedy all defective drywall, perform extensive remedial repairs to their home, and then repair the damaged property made visible during the performance of these repairs.

26.    As a result, the Plaintiffs have suffered and continue to suffer damages as a result of Defendants' defective drywall and the corrosive effects of the sulfur compounds. These damages include, but are not limited to, the costs of inspection, the costs and expenses necessary to replace and remove the defective drywall, adjoining components, electrical wiring, interior finishes and personal property.

27.    Defendants' actions also resulted in substantial diminution in the value of Plaintiffs' home.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

28.  The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment.  Defendants, through failing to disclose a known defect to Plaintiffs, and misrepresenting their product as safe for its intended use, actively concealed from Plaintiffs the true risks associated with their drywall.

29.  As a result of Defendants' actions, Plaintiffs could not reasonably know or have learned through reasonable diligence of the manufacturing defect and that Plaintiffs had been exposed to the risks alleged herein and that those risks were a direct and proximate result of Defendants' acts and omissions.

30.  Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the defective nature of their drywall.  Defendants were under a duty to disclose the true character, quality, and nature of their products because this was non-public information over which the Defendants had, and continue to have, exclusive control, and because Defendants knew that this information was not available to the Plaintiffs.  In addition, the Defendants are estopped from relying on any statute of limitations because of their concealment of these facts.

31.  Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged.  Because of the fraudulent acts of concealment of

wrongdoing by the Defendants, Plaintiffs could not have reasonably discovered the wrongdoing at any time.

## COUNT I
## STRICT PRODUCTS LIABILITY
### (Against All Defendants)

32.    Paragraphs 1 through 31 are set forth as if rewritten here.

33.    At all times herein mentioned, the Defendants manufactured, processed, distributed, delivered, supplied, inspected, marketed and/or sold drywall used in the construction of Plaintiffs' home.

34.    The drywall supplied by the Defendants was expected to, and did, reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition which it was manufactured, processed, distributed, delivered, supplied, inspected and/or sold.

35.    At those times, the Defendants' drywall was in an unsafe, defective, and inherently dangerous condition which was unreasonably dangerous to homes and, in particular, Plaintiffs' home, and to the people and contents inside those homes.

36.    The Defendants' drywall was in a defective condition unreasonably dangerous because the foreseeable risks of the product's design, formulation, or manufacture exceeded the benefits associated with the design, formulation, or manufacture of Defendants' drywall.

37.   The Defendants' drywall was also in a defective condition unreasonably dangerous under the "ordinary consumer test," because an ordinary consumer would find the drywall defective.

38.   Plaintiffs use the drywall for the purposes and manner normally intended.

39.   Plaintiffs, acting as reasonably prudent people, could not have discovered that the Defendants' drywall was defective and could not have perceived its danger.

40.   As described above, the Defendants' defective drywall has caused significant harm to the Plaintiffs' home and its contents.  The house requires extensive reconstruction and repairs, and Plaintiffs will incur repair and replacement costs, repairs for appliances, and incidental and other related expenses.

41.   By reason of the foregoing, the Defendants are strictly liable in tort to the Plaintiffs for the manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling of a defective product.

42.   Further, Defendants' defective design, manufacturing defect, and inadequate warnings of the dangers associated with their drywall were acts that amount to willful, wanton, and/or reckless conduct.

## COUNT II
## NEGLIGENCE AND NEGLIGENCE PER SE
### (Against All Defendants)

43.   Paragraphs 1 through 31 are set forth as if rewritten here.

44. Defendants had a duty to exercise reasonable care in manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling drywall they placed into the stream of commerce, including a duty to assure that the product would perform as intended and would not cause damage as described herein.

45. Defendants breached their duty by failing to exercise ordinary care in the manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling drywall they placed into the stream of commerce, in that they knew or should have known that the product was defective, did not function as intended and/or created a high risk of unreasonable, dangerous side effects, including corrosion of HVAC coils and refrigerator units, wires, tubes, and pipes.

46. The negligence of the Defendants, their agents, servants, and/or employees, included, but was not limited to, the following acts and/or omissions:

   a. manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling drywall without thoroughly testing it;

   b. manufacturing, processing, distributing, delivering, supplying, inspecting, marketing and/or selling drywall without adequately testing it;

   c. selling drywall without performing proper and sufficient tests to determine the dangers to its users;

   d. failing to adequately and correctly warn the Plaintiff of the dangers of their drywall;

   e. failing to recall or otherwise notify users at the earliest date that it became known that said product was, in fact, dangerous and defective;

f.  advertising and recommending the use of the aforesaid without sufficient knowledge as to its manufacturing defect and dangerous propensities;

g.  representing that their drywall was safe for its intended purpose when, in fact, its safety is questionable;

h.  manufacturing drywall that was dangerous to its users;

i.  processing drywall in a manner which was dangerous to its users;

j.  distributing drywall in a manner which was dangerous to its users;

k.  delivering drywall in a manner which was dangerous to its users;

l.  concealing information concerning reports of adverse effects from the Plaintiff while knowing that their drywall was unsafe, dangerous and non-conforming with accepted industry standards; and

m.  improperly concealing and/or misrepresenting information from the Plaintiff and the public, concerning the severity of risks and dangers of their drywall and/or the manufacturing defect.

47.  Upon information and belief, despite the fact that the Defendants knew or should have known that their drywall caused unreasonably dangerous side effects due to its manufacturing defect, the Defendants continued to manufacture, process, distribute, deliver, supply, market and/or sell drywall to the Plaintiffs and the consuming public.

48.  The Defendants knew or should have known that consumers such as Plaintiffs would foreseeably suffer damage and injury, both physical and economic, and/or be at an increased risk of suffering damage and injury as a result of their failure to exercise ordinary care, as well as their negligent manufacturing process.

49.     The Defendants' actions and/or inactions, by virtue of violating statutes,
        ordinances, rules and/or regulations, constitute negligence *per se*.

50.     The Defendants' negligence was the proximate cause of Plaintiffs' damages,
        injuries, harm and economic loss which they suffered and will continue to
        suffer.

51.     By reason of the foregoing, Plaintiffs experienced and/or are at risk of
        experiencing serious and dangerous side effects, and have incurred financial
        damage and injury.

52.     As a result of the foregoing acts and omissions, Plaintiffs require extensive
        reconstruction and repairs, and will incur repair and replacement costs,
        repairs for appliances, and incidental and other related expenses. Plaintiffs
        also allege that they will be required to pay for future repairs, replacement
        costs, and services.

## COUNT III
## FRAUDULENT MISREPRESENTATION AND CONCEALMENT
### (Against All Defendants)

53.     Paragraphs 1 through 31 are set forth as if rewritten here.

54.     The Defendants falsely and fraudulently represented to Plaintiffs and the
        consuming public that their drywall was fit for use, not unreasonably
        dangerous, had been tested, and was safe and effective for use.

55.     These representations were, in fact, false.

56.    When these representations were made by the Defendants, the Defendants
       knew those representations to be false, and they willfully, wantonly, and
       recklessly disregarded whether the representations were true. At the same
       time, the Plaintiffs were unaware of the falsity of said representations and
       reasonably believed them to be true.

57.    Further, the Defendants fraudulently concealed information they had
       concerning the defective nature of their drywall, which information Plaintiffs
       reasonably expected them to disclose and not conceal.

58.    The Defendants' false representations of fact and concealments of the truth
       were made with the intent of defrauding and deceiving the Plaintiffs and
       with the intent of inducing the Plaintiffs into purchasing the defective
       drywall.

59.    These acts evinced reckless, willful, indifference to the health, safety and
       welfare of the Plaintiffs.

60.    In reliance upon said representations, the Plaintiffs' home was built using the
       Defendants' drywall, thereby causing damage and injury.

61.    By reason of the foregoing, Plaintiffs experienced financial damage and
       injury.

62.    As a result of the foregoing acts and omissions, Plaintiffs require extensive
       reconstruction and repairs, and will incur repair and replacement costs,
       repairs for appliances, and incidental and other related expenses. Plaintiffs

also allege that they will be required to pay for future repairs, replacement costs, and services.

## COUNT IV
## VIOLATION OF THE FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
### (Against All Defendants)

63.    Paragraphs 1 through 31 are set forth as if rewritten here.

64.    The Defendants' acts and omissions violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et. seq.*, which was enacted to protect the consuming public from unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

65.    Plaintiffs are "consumers" and the subject transactions are "trade or commerce" as defined by Fla. Stat. § 501.203.

66.    The specific acts that are the subject of this count are that the Defendants misrepresented the truth and omitted material information concerning the safety and content of their drywall.

67.    Additionally, on its web site, Shandong Taihe advertises that "quality and reputation is the base of our company," and that its goal is "being harmonious and creative, making products outstanding, building green home" (sic).

68.    The sale of corrosive gypsum is not harmonious, outstanding, or green.

69.  The Defendants' misrepresentations and concealment of material facts constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and the knowing concealment of materials facts, in violation of FDUTPA.

70.  The Plaintiffs relied on the Defendants' statements and concealments to their detriment.  Under an FDUTPA claim, however, reliance need not even be alleged or shown.

71.  As a direct and proximate result of the Defendants' violations of Fla. Stat. §§ 501.201, *et. seq.*, Plaintiffs have suffered damages.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorney's fees.

**COUNT V**
**VICARIOUS LIABILITY**
**(Against Defendant BNBM)**

72.  Paragraphs 1 through 31 are set forth as if rewritten here.

73.  This is an action for vicarious liability against Defendant BNBM for the negligent and wrongful acts of its actual and/or apparent agents, Tai'an Taihe Shengyuan Industry and Trade Co., Ltd., Tai'an Taihe Advertisement Co., Ltd., and Taihe Paper Industry (Subsidiary Defendants).

74.  Defendant BNBM owns 100% of the Subsidiary Defendants, either directly or through intermediate subsidiary parents.

75. BNBM, at all times material, exercised strict control over the Subsidiary Defendants' operations in accordance with the requirements of BNBM's headquarters.

76. As the sole shareholder of the Subsidiary Defendants, BNBM is, and at all times material was, responsible for implementing and supervising the quality control measures to be used by the Subsidiary Defendants.

77. By establishing the Subsidiary Defendants, and by exercising strict control over their conduct and operations, Defendant BNBM acknowledged that the Subsidiary Defendants would act on its behalf as its actual and/or apparent agent.

78. The Subsidiary Defendants accepted the undertaking to act on Defendant BNBM's behalf.

79. Defendant BNBM supervises, monitors, and controls the Subsidiary Defendants daily conduct and operations, including the manufacturing, distribution, marketing and sale of their drywall products.  Furthermore, BNBM is responsible for establishing, implementing, supervising and maintaining the quality control mechanisms utilized by the Subsidiary Defendants.

80. As such, Defendant BNBM is vicariously liable for all of the damages caused by the negligent and wrongful conduct of its actual and/or apparent agents, the Subsidiary Defendants.

81.     As a result of Defendants BNBM and/or the Subsidiary Defendants' wrongful

conduct, Plaintiffs have suffered and will continue to suffer damages.

82.     As a result of the foregoing acts and omissions, Plaintiffs require extensive

reconstruction and repairs, and will incur repair and replacement costs,

repairs for appliances, and incidental and other related expenses. Plaintiffs

also allege that they will be required to pay for future repairs, replacement

costs, and services.

### COUNT VI
### BREACH OF EXPRESS WARRANTY
### (Against All Defendants)

83.     Paragraphs 1 through 31 are set forth as if rewritten here.

84.     Defendants expressly represented to Plaintiffs that Defendants' drywall was

safe, efficacious, and fit for use for the purposes intended, that the

Defendants' drywall was of merchantable quality, that Defendants' drywall

would not produce any dangerous side effects, and that Defendants' drywall

was adequately tested and fit for its intended use.

85.     Defendants' drywall did not conform to these express representations

because Defendants' defective drywall is defective and unsafe.  As a direct

and proximate result of the breach of said warranties, Plaintiffs suffered,

and/or will continue to suffer extensive damage, economic loss, personal

injuries and/or other harm.

86.     Plaintiffs did rely on the express warranties of the Defendants.

87.    The Defendants breached the aforesaid express warranties, as Defendants'
drywall was defective.

88.    Defendants knew or should have known that the aforesaid representations
and warranties are false, misleading and untrue in that Defendants' drywall is
not fit for the use intended and, in fact, produced severe and extensive
damage to Plaintiffs' home because Defendants' drywall was negligently
manufactured.

89.    Defendants expressly represented to Plaintiffs that Defendants' drywall are
safe, efficacious, and fit for use for the purposes intended, that the
Defendants' drywall are of merchantable quality, that Defendants' drywall
did not produce any dangerous side effects, and that Defendants' drywall
was adequately tested and fit for its intended use.

90.    As a result of the foregoing acts and omissions, Plaintiffs require extensive
reconstruction and repairs, and will incur repair and replacement costs,
repairs for appliances, and incidental and other related expenses. Plaintiffs
also allege that they will be required to pay for future repairs, replacement
costs, and services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and
severally, as follows:

a.    Damages in an amount to be determined at trial;

b.      Pre-judgment and post-judgment interest at the maximum rate allowable at law;

c.      Equitable, injunctive, and declaratory relief;

d.      Treble, exemplary, and/or punitive damages in an amount to be determined at trial;

e.      The costs and disbursements incurred by Plaintiffs in connection with this action, including reasonable attorneys' fees;

f.      All statutory damages;

g.      Reimbursement for all costs and expenses incurred in the repair of any purchase price paid, including, but not limited to, insurance co-payments, interest on these amounts from the date of purchase, attorneys' fees and costs, non-pecuniary damages, as well as any other legal or equitable relief to which Plaintiffs may be entitled;

h.      Other relief allowable under all applicable state and federal law, and any other relief the Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: August 31, 2009.

RESPECTFULLY SUBMITTED,

Amanda R. Slevinski
(Fla. Bar 27041)

Benjamin W. Gordon
(Trial Counsel; Fla. Bar 882836)

LEVIN, PAPANTONIO, THOMAS, MITCHELL,
    ECHSNER, AND PROCTOR, P.A.
316 South Baylen Street
Pensacola, Florida 32502
Phone: 850-435-7090
FAX:    850-436-6090
E-mail: bgordon@levinlaw.com
*Attorneys for Plaintiffs*